**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SCOTT LANCASTER,

      Plaintiff,

v.                                                                          Case No. 16-14093

NELSON LAKEY, et al.,

      Defendants.

_____/

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Scott Lancaster was arrested by Burton police officers and transported to the Genesee County jail. He alleges that through his arrest, transport, and detention, he endured violations of his Fourth, Fifth, Sixth, and Eighth Amendment rights, and he brings claims against Defendants under 42 U.S.C. § 1983. Before the court are Defendants' two motions for summary judgment, one each by officers from Burton County (Dkt. #58) and officers from Genesee County (Dkt. #59). The motions are fully briefed, and the court held a hearing on April 25, 2018. Because the factual disputes and legal issues in these motions overlap, the court will address both motions in this order. For the following reasons, Defendants' motions will be granted in part and denied in part.

### I. BACKGROUND

It should be no surprise that individuals involved in the same event often remember it differently. *See Greco v. Livingston Cty.*, 774 F.3d 1061, 1062 (6th Cir. 2014); *see also Perry v. New Hampshire*, 565 U.S. 228, 262–63 (2012) (Sotomayor, J.,

dissenting); *New Jersey v. Henderson*, 27 A.3d 872, 894–96 (N.J. 2011). Social scientists—and courts—sometimes refer to it as the "Rashomon effect," named after the Japanese film in which four witnesses to a crime describe the event in contrasting (and contradictory) ways. *See* Christopher Slobogin, *Experts, Mental States, and Acts*, 38 SETON HALL L. REV. 1009, 1012 (2008); *Greco*, 774 F.3d at 1062 (noting that "Rashomon and [summary judgment] rarely take the stage together"); *Messina v. Bonner*, 813 F. Supp. 346, 351 (E.D. Pa. 1993); *Zalutsky, Pinski, & DiGiacomo, Ltd. v. Kleinman*, 747 F. Supp. 457, 458 n.1 (N.D. Ill. 1990). This case is not one that turns on minor differences in remembered facts—no discrepancies in the color of the car, the distance between two objects, a person's exact spoken words. Rather, this case involves wildly disparate accounts of Plaintiff's arrest and detention. And unlike most cases where the parties' stories diverge, the versions of this event are most divided not near the end, but at the beginning.

From Defendant Chad Collier's point of view, this narrative begins seated in his marked police vehicle, parked in a Rite Aid parking lot. (Collier Dep., Dkt. #57 Pg. ID 319; Arrest Report, Dkt. #57 Pg. ID 356.) An officer of the Burton Police Department, Defendant Collier was on patrol. While sitting in his vehicle, he "happened to look up" and see a black GMC Yukon XL run through a blinking red light without stopping, almost colliding with another vehicle. (Collier Dep., Dkt. #57 Pg. ID 323; Arrest Report, Dkt. #57 Pg. ID 356.) He also noticed that the Yukon's license plate light was not functioning. (Collier Dep., Dkt. #57 Pg. ID 323–24; Arrest Report, Dkt. #57 Pg. ID 356.) Defendant Collier immediately decided to follow the vehicle and pull it over. (Collier Dep., Dkt. #57 Pg. ID 324.)

The Yukon pulled into the parking lot of a nearby Men's Club. (*Id.*) Defendant Collier followed, parked, got out of his patrol car, and approached the vehicle; the driver's window was already rolled down. The car had one occupant: Plaintiff Scott Lancaster. (*Id.* at Pg. ID 325.) Defendant Collier asked for Plaintiff's license, registration, and proof of insurance. (*Id.*) Plaintiff handed over his driver's license. (*Id.*)

It was at this time that Defendant Collier noticed a pill bottle in the Yukon's center console. (*Id.*) Defendant Collier was able to read part of the name on the bottle: "Betty." (*Id.* at Pg. ID 326.) When Defendant Collier asked Plaintiff about the pill bottle, Plaintiff replied that it was his grandmother's—he had run out of his own prescription, and he was using hers. (*Id.* at Pg. ID 327.)

His suspicions raised, Defendant Collier asked for Plaintiff's consent to search his person and the rest of the vehicle, which Plaintiff provided. (*Id.* at Pg. ID 327–28.) Around this time, Defendant Nelson Lakey—another Burton Police Officer—arrived on scene and monitored the search. Plaintiff had nothing of note on his person; the search of the vehicle, however, revealed three more pill bottles—two with Plaintiff's name properly printed, and one without a label but with Plaintiff's name and "600 milligram Neurontin" handwritten on it. (*Id.* at Pg. ID 330–31.) Defendant Collier informed Plaintiff that he was under arrest for possession of the pills. (*Id.* at Pg. ID 332; Arrest Report, Dkt. #57 Pg. ID 356.)

To get to this point from Plaintiff's perspective requires winding back the clock. Because, Plaintiff says, he never drove his Yukon in front of Defendant Collier. He was never pulled over. Indeed, he was never seated in the car while in Defendant Collier's presence.

From Plaintiff's perspective, this narrative begins inside the Men's Club. Plaintiff had driven there with a female companion; while he was inside drinking a beer, his companion told him that she had left her bag the car. (Lancaster Dep., Dkt. #57 Pg. ID 338.) He went out to retrieve it for her. (*Id.*)

Plaintiff got to his Yukon, opened the driver's side door, and was laying across the driver's seat searching for the bag when he noticed police lights come on behind his car. (*Id.* at Pg. ID 339.) Though he could see the bag, he left it where it was—he stood up, closed the door, and locked the car. (*Id.*) Two uniformed officers approached and asked him whether he had been drinking. (*Id.*)

The officers asked Plaintiff to put his hands on his car, and they searched his person. (*Id.* at Pg. ID 340.) After the pat down, Plaintiff was handcuffed with his hands behind his back, and he was placed in the patrol car. (*Id.* at Pg. ID 341.) Because of a preexisting back injury, Plaintiff asked that he be handcuffed with his hands in front, but the officers refused. (*Id.*) When Plaintiff asked why they were arresting him, the officers responded "Well, what do you got in your car?" (*Id.*) They took Plaintiff's keys and started searching his vehicle. (*Id.*)

According to Plaintiff, the officers opened his glove box and found his prescriptions. The prescriptions were all his—none of the bottles belonged to his grandmother Betty. Plaintiff denies ever discussing his grandmother with either of the officers. (*Id.* at Pg. ID 341–42.) He also says that all of his prescriptions were in the glove box—none were in the console. (*Id.*)

The officers did, however, show Plaintiff the bottle of his Xanax prescription and told him, "You know, you can go to jail for this." (*Id.* at Pg. ID 342.) While Plaintiff

repeatedly asked to talk to his lawyer, the officers taunted Plaintiff, calling him a "hardass" and a "Daddy's boy" until he was crying. (*Id.*) At no point did the officers inform Plaintiff that he was under arrest. (*Id.* at Pg. ID 341.)

The parties' versions of events converge at this point in their basic outline, if not in the specifics. Defendant Collier transported Plaintiff to the Burton Police Department. He says that Defendant Lakey followed in a separate patrol car; Plaintiff says that Defendant Lakey joined them in the same car. (*See* Collier Dep., Dkt. #57 Pg. ID 334; Lancaster Dep., Dkt. #57 Pg. ID 343.) Defendant Collier says that he did not speak to Plaintiff, but that Plaintiff was nevertheless verbally abusive, cursing and calling him a number of names. (Collier Dep., Dkt. #57 Pg. ID 334–35; Arrest Report, Dkt. #57 Pg. ID 356.) Plaintiff denies being verbally abusive, and he maintains that the officers were taunting him about how he was going to spend 72 hours in jail. (Lancaster Dep., Dkt. #57 Pg. ID 343; *see also* Dkt. #64 Pg. ID 758.)

At the Burton Police Department, Plaintiff was allegedly photographed and fingerprinted (Plaintiff maintains that he requested documentation of this in discovery, but Defendants refused to provide it (*see* Dkt. #64 Pg. ID 759)) and the pills from his vehicle were logged into evidence (Arrest Report, Dkt. #57 Pg. ID 356). Plaintiff says that the logged pills were not his, that the Defendant officers did not log his prescriptions, and that the Defendant officers claim to have lost his pills (*see* Dkt. #64 Pg. ID 759)—but he provides no supporting citation to the record.

Defendant Lakey then transported Plaintiff to the Genesee County jail. (Lakey Dep., Dkt. #57 Pg. ID 363.)[1] On arrival, Defendant Lakey escorted Plaintiff out of the

---

[1] In a Rashomon twist, Defendant Lakey has no independent memory of any of

car, into the building, and onto an elevator that goes up to the receiving area. (Kirby Dep., Dkt. #57 Pg. ID 370.) Defendant Nathon Kirby, a Genesee County Sheriff Deputy, was sitting in central dispatch and watching the monitors there as Defendant Lakey accompanied Plaintiff up to the receiving area. Defendant Kirby watched as Defendant Lakey kept a grip on Plaintiff's arm, just below the elbow. (*Id.* at Pg. ID 371.) Defendant Pamela Sanchez, then a Genesee County Sheriff Sergeant, was also watching the monitor. According to Defendant Sanchez, Plaintiff appeared to be "pulling away" from Defendant Lakey and "getting mouthy" with him. (Sanchez Dep., Dkt. #57 Pg. ID 380.) Plaintiff denies this, again without citation to the record. (Dkt. #64 Pg. ID 759.)

Surveillance video presented in this case (submitted to the court by mail, *see* Dkt. #59-12) shows Plaintiff and Defendant Lakey exiting the elevator into the receiving area: Defendant Lakey entered in front of Plaintiff, held the door open for him, and turned his back on Plaintiff before taking a seat at a nearby table. Though the video lacks sound, the testimony establishes that he also instructed Plaintiff to have a seat on the nearby bench. (Kirby Dep., Dkt. #57 Pg. ID 372.) Defendant Lakey, having sat down at the table in the receiving area, worked on Plaintiff's booking card. (*Id.*) Plaintiff cannot recall ever seeing Defendant Lakey again. (Lancaster Dep., Dkt. #57 Pg. ID 344.)

Defendants maintain that in the receiving area, Plaintiff was creating a verbal disturbance, cursing and questioning why he was there. (Kirby Dep., Dkt. #57 Pg. ID 373.) The surveillance video shows the officers at first apparently ignoring Plaintiff and

---

the events surrounding Plaintiff's arrest, transport, or detention, and relies almost entirely on Defendant Collier's report for his testimony in this case. (Lakey Dep., Dkt. #57 Pg. ID 363.) Plaintiff does not contest, however, that Defendant Lakey transported him to the Genesee County jail—though he also contends (again, without citation to the record) that Defendant Collier was also part of the transfer. (Dkt. #64 Pg. ID 759.)

chatting with one another. Most appear to have casual body language, and at some points, none of the officers is facing Plaintiff.



Defendant D. Bouchard, a Genesee County Sheriff Deputy, approached Plaintiff and told him to stand facing the wall. (Kirby Dep., Dkt. #57 Pg. ID 373.) Defendant Bouchard conducted a pat down on Plaintiff before removing Plaintiff's handcuffs and performing a more thorough search of his person. (*Id.* at Pg. ID 374.) Defendant Bouchard found no weapons or contraband.

Defendant Bouchard then instructed Plaintiff to remove his shoes. (*Id.* at Pg. ID 375.) Plaintiff removed his shoes with his feet. He has two explanations for why: first, that he was handcuffed and unable to take the shoes off with his hands (*see* Lancaster Dep., Dkt. #57 Pg. ID 344), and second, that he had a back condition that prevented him from taking his shoes off with his hands, a fact he communicated to the officers (*see id.*). The surveillance video belies the first contention—Plaintiff was no longer handcuffed when he took his shoes off. Because the video is without audio, however,

his second explanation remains a possibility. Defendants maintain that Plaintiff "kicked" his shoes off at them (*see, e.g.*, Kirby Dep., Dkt. #57 Pg. ID 375), a characterization Plaintiff denies. At any rate, Plaintiff's shoes landed on the floor near Defendants Bouchard and Kirby.



According to Defendants, Defendant Bouchard asked Plaintiff to pick up his shoes, but Plaintiff refused. (Kirby Dep., Dkt. #57 Pg. ID 375.) Defendant Sanchez advised that they should finish their search of Plaintiff in a safe cell. (*Id.*) She says she made this decision "[b]ecause of the totality of the circumstances, the way [Plaintiff] came through the elevator, his agitation," the verbal disturbance Plaintiff was making, and Plaintiff's refusal to follow Defendant Bouchard's commands. (Sanchez Dep., Dkt. #59-4, Pg. ID 520.)

Defendant Bouchard pulled Plaintiff's arm behind his back and escorted him down the hallway; Defendant Kirby and Defendant Sanchez followed. (*Id.* at Pg. ID 376.) In the video, Defendant Kirby can be seen reaching down to his duty belt.

Defendant Lakey did not follow the others, or at least not immediately—the surveillance video shows him looking down the hall before the video feed ends.

Defendants Kirby, Bouchard, and Sanchez escorted Plaintiff down the hall. According to Defendants, Plaintiff continued to be "verbal," complaining about being detained and telling Defendants to leave him alone. (Sanchez Dep., Dkt. #59-4 Pg. ID 524; Kirby Dep., Dkt. #59-3 Pg. ID 499.) Though there was apparently video surveillance capability for the hallway, there is no video showing Plaintiff being escorted down the hall—for reasons unknown, there are gaps in the video provided to Plaintiff, and this time span is one such gap. (Gould Dep., Dkt. #67 Pg. ID 929–30.)

When they got to the holding cell, Plaintiff got up on the metal bench inside, sitting up on his knees and facing the wall. (Kirby Dep., Dkt. # 59-3 Pg. ID 500.) Defendants Kirby and Bouchard were inside the cell with Plaintiff; Defendant Sanchez stood outside. (*Id.*) Surveillance video from inside the cell shows that Defendant Bouchard directed Plaintiff to put his hands on the wall. Defendant Bouchard promptly searched Plaintiff, patting down Plaintiff's pants and then removing his socks. Defendant Kirby held Plaintiff's right arm against the wall during the entire process. According to Defendant Kirby, Plaintiff was making a verbal disturbance, yelling and calling Defendant Sanchez a "c***." (*Id.* at Pg. ID 501.) At some point, Defendant Bouchard instructed Plaintiff to remove his shirt. (*Id.*) Defendant Kirby maintains that Plaintiff refused, necessitating multiple commands from Defendant Bouchard and one from Defendant Sanchez. (*Id.*) Indeed, Defendant Kirby says that as soon as Defendant Sanchez told Plaintiff to remove his shirt, Plaintiff "became very loud, verbal[ly]

assaultive towards Sergeant Sanchez, yelling at her, calling her the C word, and causing more of a disturbance." (*Id.*)

The video—though still without audio—tells a different story: Defendant Kirby kept a hold on Plaintiff from the moment Plaintiff put his hands on the wall, and Plaintiff removed his shirt as soon as Defendant Kirby let go of his arm. Plaintiff handed over his shirt, and Defendant Kirby immediately pepper sprayed[2] Plaintiff in the face. The following stills capture a 4 second interval in the surveillance video:





---

[2] In briefing, the Genesee Defendants interchangeably refer to OC spray, pepper spray, and mace. *See, e.g.*, Dkt. #59 Pg. ID 418. The court notes that "OC" spray (or "Oleoresin Capsicum" spray) is another term for pepper spray, but that mace is a different chemical compound. *See Thompson v. Joseph*, No. 12-992, 2014 WL 1685918, at *2 (S.D. Ohio Apr. 29, 2014). Because the parties refer to them as equivalents—and the court cannot tell which was actually used—the court will similarly refer to mace and pepper spray as the same compound.

Defendant Kirby says that he felt the need to pepper spray Plaintiff because the officers had to take Plaintiff to general population, and "at that point [Plaintiff] got pepper sprayed for causing more of a disturbance and becoming loud." (*Id.*) He further explained: "There's only so much we can do as far as we've gotta get the situation under control because it's causing a disturbance to other inmates, other deputies, and could cause further actions as far as we don't know." (*Id.*) Both Defendant Kirby and Defendant Bouchard testified that the use of pepper spray was consistent with their department's use of force policy, which permits the use of pepper spray in situations where the officer or others are threatened or where necessary to quell a disturbance. (Kirby Dep., Dkt. #59-3 Pg. ID 503; Bouchard Dep., Dkt. #59-5 Pg. ID 543.)

The video time stamps show that Plaintiff—through the search, removal of his socks, and removal of his shirt—was in the cell for 37 seconds before he was pepper sprayed in the face. After Plaintiff was pepper sprayed, Defendants Kirby and Bouchard physically forced him down onto the metal bench and stripped him of the remainder of his clothing. They left him naked in the cell. As they exited, Defendant Sanchez told Defendants Kirby and Bouchard to get Plaintiff some clothes, and she told Plaintiff that he could decontaminate his eyes using the nearby sink. (Sanchez Dep., Dkt. # 59-4 Pg. ID 528.) Subsequent video shows Plaintiff using the sink several times to rinse his eyes. Eventually he was provided with a jumpsuit and sandals.

Plaintiff recounts a very different version of events, and one that is at times internally contradictory. Plaintiff maintains that five officers were in the hall with him, including "the officer that brought [him] in." (Lancaster Dep., Dkt. #59-2 Pg. ID 467.) Contrary to the Genesee Defendants' assertion that he was being "verbal," Plaintiff

maintains that he did not say anything. (*Id.* at Pg. ID 470.) He says that at some point, one of the officers used a taser on him, probably in the hallway. (*Id.* at Pg. ID 469.) He was not resisting any of the officers when he was tased, and he believes he lost consciousness. (*Id.* at Pg. ID 470.) He also remembers being "thrown around and beaten up" in the hallway, and his head hitting the wall. (*Id.* at Pg. ID 471.) Plaintiff was pepper sprayed for the first time while he was in the cell, he says, but his testimony is unclear as to whether he was pepper sprayed for the first time while wearing his street clothes or his jail jumpsuit (the surveillance video suggests the former).[3] He says that the Genesee Defendants kept calling him a "hardass" and a "Daddy's boy," and he insists that he was not being verbally abusive—instead, he says, he kept asking why the officers were treating him this way. (*Id.* at Pg. ID 467.)

According to Plaintiff, sometime after he put on his prison jumpsuit—the record does not reveal how long—some unidentified Defendants came into his cell and made him take it off. (Lancaster Dep., Dkt. #59-2 Pg. ID 468.) Defendant Sanchez was among the Defendants in the cell, and Plaintiff was upset about undressing in front of a female. He called Defendant Sanchez a "c***." (*Id.*) At that point, he was maced in the eyes a second time, then maced in the genitals—all by the same Defendant that maced him the first time—while that Defendant said "This is for her." (*Id.*) After the officers left, Plaintiff, covered in mace, took off his jumpsuit and laid naked on the floor. (*Id.*)

---

[3] Q. All right. And you were wearing your regular clothes [when you were pepper sprayed]? A. Uh-huh. Q. Yes? A. No. I was in the orange jumpsuit. Q. At the time you were maced in the face? A. Uh-huh. . . . A. But you believe you were in the jumpsuit at the time you were first sprayed, correct? A. Yeah." (Lancaster Dep., Dkt. #59-2 Pg. ID 467–68.)

Defendants maintain that—besides Defendant Kirby pepper spraying Plaintiff in the face, as captured by the video—none of these events happened. Indeed, Defendants say that Taser Use Logs from the jail show that none of the Genesee Defendants checked out a taser on the shift in question. (*See* Dkt. #59 Pg. ID 428.) Plaintiff responds that there is evidence to suggest that Defendant Bouchard had a taser that night, even if one was not checked out to him. (*See* Hovey Dep., Dkt. #67 Pg. ID 933 ("Q. And Bouchard also was carrying a Taser on the date of the incident? A. Yes.") And while the parties have submitted some surveillance video from Plaintiff's cell on the night in question, there are gaps in the timeline. There is, for example, no video footage in the hallway spanning from the receiving area to the cell Plaintiff was placed in. Nor is there complete video footage of the time Plaintiff spent in the cell. (*See* Dkt. #59 Pg. ID 428–29.)

Plaintiff alleges that he spent 72 hours at the Genesee County jail. He says that he asked multiple times to use the telephone to talk to an attorney, but that Defendants would not allow him to use the phone. Plaintiff says that his experiences have resulted in multiple hospitalizations. (Dkt. #68 Pg. ID 975.)

Setting aside the issue, noted above, of what precisely was logged into evidence, two prescription pill bottles made their way to the Michigan State Police Lab for testing. (Dkt. #57 Pg. ID 358–60.) The lab eventually determined that neither contained controlled substances. No charges were ever filed against Plaintiff. (*Id.* at Pg. ID 360.)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). The facts in dispute must be material and genuine to warrant a denial of summary judgment—"[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

Plaintiff alleges that Defendants Collier and Lakey ("the Burton Defendants") violated his Fourth Amendment rights, and that Defendants Bouchard, Kirby, and Sanchez ("the Genesee Defendants") violated his Fourth, Fifth, Sixth, and Eighth Amendment rights and were involved in a conspiracy to commit the same. He relatedly asserts claims for failure to intervene, alleging that each of the individual Defendants is liable for failing to prevent the others from violating his rights. Defendants move for summary judgment primarily on the bases that Plaintiff has not established violations of his constitutional rights, that he has not established that they are liable for failure to

intervene, and that they are entitled to qualified immunity. The Genesee Defendants also argue that there is no evidence to support Plaintiff's claim for conspiracy.

To establish his claims under 42 U.S.C. § 1983, Plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Defendants do not dispute that they were, as relevant here, acting under color of state law. Plaintiff therefore bears the burden to prove that Defendants deprived him of a right secured by the Constitution.

### A. Unreasonable Search and Seizure and False Arrest

Plaintiff claims that the Burton Defendants are liable for violating his Fourth Amendment rights because they seized him, arrested him, and searched his vehicle without probable cause. The Burton Defendants disagree.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A police stop of a vehicle—even one amounting to no more than a temporary detention—constitutes a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Police traffic stops, therefore, are evaluated for their reasonableness. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). A traffic stop may be reasonable even where pretextual; an officer may

validly stop a vehicle on probable cause of a traffic violation even where the officer's purpose is to search for narcotics or other contraband. *Id.* But the vehicle stop alone does not permit the officer to search the driver or the car: "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects." *Florida v. Royer*, 460 U.S. 491, 499 (1983).

A claim for false arrest in violation of the Fourth Amendment turns on the existence of probable cause: "[a] false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Where a driver is lawfully arrested, the police may validly conduct a search of the vehicle "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009).

Here, the Burton Defendants argue that they are entitled to summary judgment on Plaintiff's Fourth Amendment claims related to the traffic stop because they had probable cause to stop Plaintiff's vehicle. The court need not conduct the suggested probable cause analysis, however, because their argument on this point completely ignores Plaintiff's sworn testimony. Plaintiff testified that he never drove his car in front of the Burton Defendants. There is nothing in the record to blatantly contradict that testimony. And it is worth noting again here that Defendant Lakey has no memory of ever conducting a traffic stop with Plaintiff. (*See* Lancaster Dep., Dkt. #63 Pg. ID 704 ("Q. Did you ever see Scott Lancaster driving the Yukon on the date of the incident? A. No.")). Plaintiff asserts, in other words, that there was no "traffic stop" at all, but rather

that the Burton Defendants, without reasonable suspicion, unlawfully stopped him in the parking lot. *See Hoover v. Walsh*, 682 F.3d 481, 493 (6th Cir. 2012) (noting that an officer may "seize an individual without offending the Fourth Amendment if the officer has reasonable suspicion that criminal activity may be afoot" (internal quotation omitted)). The Burton Defendants would, perhaps, have been entitled to summary judgment if Plaintiff had claimed that they conducted a traffic stop in the absence of probable cause. But Plaintiff has alleged no constitutional violation on that basis. The Burton Defendants, in essence, ask for summary judgment on a claim that Plaintiff has not brought.

More significant for summary judgment purposes is the Burton Defendants' claim that they had probable cause to arrest Plaintiff for the pill bottle visible in his console. But according to Plaintiff, all of his prescriptions were in the glove box—not the console. (Lancaster Dep., Dkt. #57 Pg. ID 341–42.) The Burton Defendants (rightfully) do not attempt to persuade the court that as-yet undiscovered prescription bottles could justify Plaintiff's arrest for possession of prescriptions that were not his. Instead, they ignore Plaintiff's version of events altogether.

As the parties should no doubt be aware, the court at this stage is obligated to consider the evidence in the light most favorable to Plaintiff—it does not make credibility determinations on a motion for summary judgment. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The Burton Defendants' motion on this point does not even mention Plaintiff's testimony, let alone explain why the court should ignore it in favor of the Burton Defendants' explanation for what happened. (*See* Dkt. #58 Pg. ID 404–06.)

Apparently recognizing this impediment to their argument, the Burton Defendants finally address Plaintiff's testimony in their reply. (Dkt. #72 Pg. ID 1002.) According to the Burton Defendants, the court can disregard Plaintiff's version of events because it is blatantly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Plaintiff's version of events is riddled with inconsistencies," say the Burton Defendants, and their version can be the only correct one because Defendant Collier could not possibly have known that Plaintiff's grandmother is named "Betty" unless Plaintiff told him as much. (Dkt. #72 Pg. ID 1002.) The Burton Defendants had probable cause to arrest Plaintiff, therefore, and their search of his vehicle amounts to a constitutionally-permissible search incident to arrest. *See Arizona v. Gant*, 556 U.S. 332, 335 (2009).

Not so. While it seems likely that Plaintiff—contrary to his testimony—discussed "Betty" with the Burton Defendants at some point, that likelihood is not itself sufficient to compel the court to disregard all of Plaintiff's testimony. Indeed, it is possible that the Burton Defendants found a prescription bottle with "Betty" written on it in Plaintiff's glove box (where the remaining prescriptions were allegedly found, *see* Lancaster Dep., Dkt. #57 Pg. ID 341)—out of plain sight of the Burton Officers and insufficient to establish probable cause for Plaintiff's arrest and the subsequent search of his vehicle. It is also possible that "Betty" came up during some unrelated discussion between the Burton Defendants and Plaintiff. At this stage, the court cannot say that the evidence, viewed in the light most favorable to Plaintiff, demonstrates that there is no genuine dispute of material fact. The Burton Defendants' proffered explanation for how Defendant Collier knew that Plaintiff's grandmother was "Betty" is one that they can put before the jury— not one that entitles them to summary judgment.

The Burton Defendants also alluded, for the first time at oral argument, to the idea that even taken from Plaintiff's perspective, his interactions with the Burton Defendants amounted to a "consensual encounter" that cannot be said to violate his Fourth Amendment rights. This argument similarly lacks support in Plaintiff's testimony. To the extent that the Burton Defendants claim that Plaintiff consented to any search, it is their burden to prove it: "where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Plaintiff's "submission to a claim of lawful authority" is insufficient to meet that burden. *Id.* The court has no difficulty finding that burden unmet here. Plaintiff never testified that he consented to the searches he complains of. Indeed, it is difficult to imagine when he could have done so, given that—as he claims—he was arrested without probable cause before the Burton Defendants searched his vehicle. The Burton Defendants are not entitled to summary judgment on the basis of Plaintiff's alleged consent.

At this point, the court will also note that the Burton Defendants have made a number of misleading statements regarding the "Material Facts" in this case. The Burton Defendants, for example, aver in both motion and reply that Plaintiff's father "confirmed that his son's grandmother's name is Betty and that his son would, on occasion, use [] Betty's medication." (Dkt. #58 Pg. ID 394; *see also* Dkt. #72 Pg. ID 1002.) This is the relevant deposition testimony:

Q.	And why was [Plaintiff] in possession of her medication?

		MS. PUZZUOLI: Objection, form and foundation.

A.	I don't – I guess I don't know whether – which medication it was. I don't know. For example, I think, I think Betty may've taken

> Neurontin for nerve pain, and Neurontin is fairly expensive, and [Plaintiff] did not have medication insurance at the time, to the best of my knowledge, so it's possible he ran out. I don't know. I'm speculating.

(Dkt. #57 Pg.ID 351.) So, too, do the Burton Defendants claim that "Plaintiff's mother confirmed, at the time of her deposition, that her mother Betty had a prescription for Neurontin." (Dkt. #58 Pg. ID 396; *see also* Dkt. #72 Pg. ID 1002.) The cited deposition testimony reads:

> Q. Your mother, Betty Teasley. Is it true that [Plaintiff] had ran [sic] out of some of his prescription medications so he borrowed some of your mom's?
>
> MS. PUZZUOLI: Objection. Form, foundation.
>
> A. I don't know.
>
> Q. Does your mother take Neurontin, do you know?
>
> A. I think she used to.

(Dkt. #57 Pg. ID 353.) This testimony—equivocating and conjecture at best—cannot fairly be characterized as "confirmation" that Plaintiff would use his grandmother's medications on occasion or that Plaintiff's grandmother had a current prescription for Neurontin. The court offers the following caution: while counsel may set forth reasonable extrapolations from the evidence, counsel should also take a hard look at supporting record evidence before presenting a "material fact" to the court. Supportable inferences from the record are permitted; misrepresentations are not. And the latter reflects poorly on counsel's arguments.

The Burton Defendants have not carried their burden to show that there is no genuine issue of material fact in this case. But the burden will shift when it comes to the next phase of this litigation. At trial, it will be Plaintiff's burden to show that the officers

violated his Fourth Amendment rights because they lacked probable cause to detain and arrest him, and because they lacked probable cause to search his vehicle. In effect, this will require Plaintiff to prove, by a preponderance of the evidence, that his version of events is the correct one—that the Burton Defendants did not see a prescription pill bottle with "Betty" in his console, that they arrested him without evidence that he possessed prescription drugs that did not belong to him, and that they searched his car with no evidence that he had committed a crime.

## B. Excessive Force

A claim for excessive use of force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Reasonableness "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* There is a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002).

The court takes into account various factors in determining the reasonableness of force used, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 389.

### i. The Burton Defendants

The Burton Defendants argue that they are entitled to summary judgment on Plaintiff's claims for excessive force because Plaintiff has set forth no evidence

demonstrating that they used force on him at any time. Plaintiff responds that the act of forcefully handcuffing him for an alleged civil infraction, exacerbating a preexisting back injury, is sufficiently excessive force under Sixth Circuit precedent. In reply, the Burton Defendants contend that even if their handcuffing of Plaintiff caused him pain, there is no allegation that it caused him *injury*.

The Fourth Amendment protects "freedom from excessively forceful or unduly tight handcuffing." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). The Sixth Circuit has established a narrow standard within which a plaintiff may properly allege excessively forceful handcuffing: the plaintiff must show that "(1) he complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Getz v. Swoap*, 833 F.3d 646, 654 (6th Cir. 2016). The physical injury need not be severe. *Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016). The Sixth Circuit has reversed a grant of qualified immunity, for example, where the plaintiff alleged that being handcuffed caused numbness and swelling in his hands. *Martin v. Heideman*, 106 F.3d 1308, 1312–13 (6th Cir. 1997); *see also Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 402 (6th Cir. 2009) (noting that bruising on the wrist may support a claim for excessively tight handcuffing).

But there must, indeed, be injury. The Sixth Circuit has not definitively stated whether pain—and pain alone—during handcuffing may constitute an "injury" sufficient to establish excessively forceful handcuffing. At least one case has suggested that it might be; in *Courtright v. City of Battle Creek*, the plaintiff claimed that "he suffered from prior rotator-cuff injuries and shoulder surgeries, that he could not put his hands behind

his back because of his medical condition, and that he suffered from pain after he was handcuffed behind his back." 839 F.3d at 520. When considering whether the defendants were entitled to dismissal on the basis of qualified immunity, the Sixth Circuit seemed to equate "pain" with "injury" for the purposes of excessively forceful handcuffing; it noted that the court "reasonably may infer that [the plaintiff] was handcuffed in a manner that aggravated his prior medical injuries, that he suffered pain from that handcuffing, and that *he thus was physically injured* by the handcuffing." *Id.* (emphasis added). Critically, though, the *Courtright* court specifically noted that its decision was being made at the motion to dismiss stage—not the summary judgment stage. *Id.* at 519. The plaintiff's allegations, therefore, could reasonably have supported an inference that the plaintiff did suffer some form of physical injury beyond pain during handcuffing, one that would be further elucidated during discovery. Other Sixth Circuit cases dealing with the injury requirement appear to turn on the existence of injury *beyond* pain. *See Jones v. Garcia*, 345 F. App'x 987, 989 (6th Cir. 2009) ("As with excessive-force claims arising from improper handcuffing, this is not a case where the suspect merely registered subjective complaints of pain."); *Crooks v. Hamilton Cty.*, 458 F. App'x 548, 550 (6th Cir. 2012) (reversing grant of summary judgment on the basis of qualified immunity where the plaintiff alleged a broken rib and chest wall injury following handcuffing); *Kahlich v. City of Grosse Pointe Farms*, 120 F. App'x 580, 584 (6th Cir. 2005) (affirming grant of summary judgment on the basis of qualified immunity were the plaintiff alleged that he was not physically injured by his handcuffing).

Here, Plaintiff's threadbare testimony does not meet the injury requirement for excessively forceful handcuffing. Plaintiff says that he had a preexisting back injury, that

he requested that he be handcuffed with his hands in front because of that injury, and that the Burton Defendants refused his request. But he alleges nothing in the way of an *injury* beyond the pain that he felt having his hands cuffed behind his back. (Lancaster Dep., Dkt. #57 Pg. ID 341.) And though Plaintiff apparently saw a doctor following his release from jail, there is no evidence that the doctor examined Plaintiff's back or shoulders or that Plaintiff complained that those areas were injured. (*See* Bartsoff, M.D., Dep., Dkt. #66 Pg. ID 858–59.) Other than a subjective complaint of pain, then, Plaintiff points to nothing in the record showing that he suffered an actual physical injury.[4] In the absence of such an injury, the Burton Defendants are entitled to summary judgment on Plaintiff's claim for excessively forceful handcuffing.

Defendant Lakey is also entitled to summary judgment for participation in the alleged excessive force at the Genesee County jail. True, the evidence is inconclusive as to whether Defendant Lakey ever followed Plaintiff and the Genesee Defendants down the hallway to the holding cell: though the surveillance video shows him looking down the hallway after Plaintiff and the Genesee Defendants, the video cuts out sufficiently early that the court cannot definitively say that Defendant Lakey stayed where he was. But other than Plaintiff's statement that five officers were in the hall with

---

[4] Plaintiff has pointed to no record evidence of a physical injury, and the court is under no obligation to search for it. Fed. R. Civ. P. 56(c)(3). And the court notes that the evidence that *has* been cited in this case is at least consistent with the absence of physical injury. The video evidence, which captures Plaintiff sitting handcuffed in the receiving area of the Genesee County Jail, shows Plaintiff in no apparent distress as he sits for some minutes waiting to be searched; he does not squirm or shift position, nor does he appear to be in any significant pain. So, too, does the video evidence from the cell show Plaintiff remove his shirt with no apparent trouble or strain. Nothing that the court has reviewed, in other words, evidences a physical injury beyond Plaintiff's alleged discomfort during handcuffing.

him during the walk to the cell, including "the officer that brought [him] in" (Lancaster Dep., Dkt. #59-2 Pg. ID 467), there is no evidence tying Defendant Lakey to that hallway at all—let alone evidence showing that he used excessive force on Plaintiff at that time. On this record, Plaintiff has not demonstrated that a rational jury could find, by a preponderance of the evidence, that Defendant Lakey used or participated in the use of excessive force on Plaintiff at the Genesee County jail. Defendant Lakey is entitled to summary judgment as to that claim.

### ii. The Genesee Defendants

As an initial matter, the Genesee Defendants contend that the court should disregard certain of Plaintiff's claims as "directly refuted by the video evidence." (Dkt. #59 Pg. ID 432.) These include, according to the Genesee Defendants, Plaintiff's allegations that he was told to remove his clothing in front of Defendant Sanchez; that Plaintiff's head was, according to the complaint, "smashed" into the wall after he was pepper sprayed; that Plaintiff, as described in the complaint, was "slammed" onto the bench in his cell; and that all the Genesee Defendants physically assaulted Plaintiff, sprayed him in the face and genitals with mace, and shocked him with a taser. They similarly argue that the court should ignore Plaintiff's claims that he was handcuffed when told to take off his shoes, that there were five officers in the cell with him when he was pepper sprayed, that Plaintiff was in a jail jumpsuit when pepper sprayed, that Plaintiff removed his jumpsuit because he was covered in pepper spray, and that Plaintiff did not use the cell sink to wash his eyes.

Some of these allegations by Plaintiff are indeed directly refuted by the video evidence. The surveillance video shows that Plaintiff's head was not slammed into the

wall after he was pepper sprayed, that Plaintiff was not handcuffed when instructed to remove his shoes, and that Plaintiff did use the sink to rinse his eyes after he was pepper sprayed.

But the video does not "directly refute" *all* of these claims. Plaintiff, for example, contends that after he put on his jail jumpsuit, the officers later told him to take it off so that they could strip search him again. He says that it was then that he was instructed to undress in front of Defendant Sanchez, pepper sprayed a second time in the face and genitals, and removed his jumpsuit because it was covered with mace. (Lancaster Dep., Dkt. #59-2 Pg. ID 468.) Though Plaintiff's testimony on the timeline is unclear (he does not describe how much time elapsed between him putting on the prison jumpsuit and the officers strip searching him again, *see* Lancaster Dep., Dkt. #59-2 Pg. ID 468), taken in the light most favorable to Plaintiff, it is possible that the events Plaintiff describes happened *after* the provided surveillance video cuts out. The Genesee Defendants themselves admit that the video from the holding cell only captures about 20 minutes of time. *See* Dkt. #59 Pg. ID 428. That the video does not depict Plaintiff's second alleged assault, in other words, does not mean that it did not happen. To the extent that the Genesee Defendants seek summary judgment on these claims by contending that they are "directly refuted" by the video evidence, it is denied.

The same is true for the Genesee Defendants' claim that the video evidence undermines Plaintiff's allegation that he was assaulted in the hallway on the way to the holding cell. According to the Genesee Defendants, the timestamps on the videos show that a mere eighteen seconds elapsed between the time Plaintiff left the booking area and the time Plaintiff walked into the holding cell, apparently "in no distress." Eighteen

seconds, the argument goes, is simply not enough time to assault Plaintiff, tase him, have him lose and regain consciousness, and then bring him in the holding cell. Such a sequence of events does seem unlikely—but, as relevant here, they do not appear to so border on the *impossible* as to warrant summary judgment. This is especially so in light of testimony indicating that Defendant Bouchard had a taser on the night of Plaintiff's arrest. (*See* Hovey Dep., Dkt. #67 Pg. ID 933.) In essence, the Genesee Defendants invite the court to make a credibility determination about whether Plaintiff's claimed assault could have happened in the time allotted. The court cannot make such a determination here.

The only claim for excessive force that the Genesee Defendants address head-on is Plaintiff's claim (captured by the surveillance video) that Defendant Kirby pepper sprayed him in the face. The court analyzes the use of a chemical weapon like pepper spray in the same way that it analyzes the use of more traditional forms of force: for reasonableness. *See Vaughn v. City of Lebanon*, 18 F. App'x 252, 266 (6th Cir. 2001) (citing *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994)).

The Genesee Defendants argue that the decision to pepper spray Plaintiff was reasonable—Plaintiff was being disruptive, they say, pulling away from Defendant Lakey in the elevator, arguing with the officers from the moment he arrived at the jail, refusing to follow instructions, being loud, calling Defendant Sanchez a "c***," and refusing to follow directions by removing his shirt. (*See* Dkt. #59 Pg. ID 433–34.) The problem with this argument is that it ignores Plaintiff's testimony. Plaintiff denies being disruptive, denies arguing with the officers, denies that he refused to follow directions, and denies calling Defendant Sanchez a "c***" at that time (though he admits he called

her that later, when she was allegedly in the cell as he was told take off his jumpsuit). The surveillance video from the receiving area could be interpreted, at least, to support Plaintiff's testimony. Though the Genesee Defendants maintain that Plaintiff was causing a verbal disruption, the video appears to show them casually chatting and joking with one another; at one point, not a single Defendant was so much as looking at Plaintiff.

A rational juror could similarly find that video evidence from the cell supports Plaintiff's claim that he followed directions in removing his shirt—he took it off as soon as Defendant Kirby released his arm. And though the video evidence lacks sound, Plaintiff seems compliant, and a rational juror could so find. He does not move erratically. He keeps his hands on the wall until he takes off his shirt. Though his head is down before he is pepper sprayed—blocking view of his mouth—nothing about Plaintiff's body language suggests that he is being verbally disruptive or loud. He is not breathing heavily, his body does move as though he is shouting. Taking the evidence in the light most favorable to Plaintiff, there is a genuine issue of fact as to whether Defendant Kirby's use of pepper spray amounted to excessive force.

### C. Failure to Intervene

Defendants also contend that they are entitled to summary judgment on Plaintiff's claims for failure to intervene. To establish liability for failure to intervene in another officer's excessive use of force, the plaintiff must demonstrate that "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Mere presence during an

altercation is insufficient to establish liability—the plaintiff must make some showing of "direct responsibility." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013).

### i. The Burton Defendants

As to the Burton Defendants, Plaintiff has not shown that there is a genuine issue of material fact such that his claim for failure to intervene should survive summary judgment. Plaintiff seems to concede that there is no viable claim against Defendant Collier for failure to intervene: the portion of his response addressing failure to intervene nowhere even mentions Defendant Collier. As to Defendant Lakey, Plaintiff argues that there is a question of material fact as to whether Defendant Lakey went down the hallway, and thus "[t]he video can be interpreted to show that Defendant Lakey, at the very least, observed or had reason to know that excessive force would be or was being used and had the opportunity and means to prevent the harm from occurring." (Dkt. #64 Pg. ID 776.) Plaintiff reaches too far. Even viewed in the light most favorable to Plaintiff, there is insufficient evidence on the record, as noted above, to establish that Defendant Lakey ever went down the hall. More significantly here, there is no evidence to suggest that, if Plaintiff's alleged harm did occur, Defendant Lakey would have had the opportunity and means to intervene. The Burton Defendants are entitled to summary judgment on Plaintiff's claims for failure to intervene.

### ii. The Genesee Defendants

Plaintiff has also not demonstrated that any of the Genesee Defendants had the opportunity and means to intervene in the alleged excessive force. While the video shows that Defendant Bouchard watched as Defendant Kirby pepper sprayed Plaintiff, it also shows that it took only two to three seconds for Defendant Kirby to lean forward

and use the pepper spray. Even if a jury determines that Defendant Kirby's use of pepper spray amounts to excessive force, Plaintiff has not shown that Defendant Bouchard had enough time to prevent or stop that use. *See Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (determining that a use of force lasting "no more than ten seconds" was insufficient to provide the defendants with an opportunity to intervene). Plaintiff has not, moreover, set forth any evidence showing that Defendant Bouchard should have anticipated that Defendant Kirby would pepper spray Plaintiff. *See id.* Plaintiff argues that Defendant Kirby, as shown in the video, removed his pepper spray from his duty belt about ten seconds before he pepper sprayed Plaintiff, and Defendant Bouchard therefore should have known that Defendant Kirby was just waiting to use the pepper spray. But the video evidence does not show that Defendant Bouchard saw Defendant Kirby remove his pepper spray, nor does it show that Defendant Bouchard would have some other reason to know that Defendant Kirby had done so. And Defendant Bouchard denies having any knowledge that Defendant Kirby had removed his pepper spray or was going to use it. (*See* Bouchard Dep., Dkt. #59-5 Pg. ID 561.) In short, there is insufficient evidence by which a jury could find Defendant Bouchard liable for failure to intervene.

Plaintiff similarly has not set forth any evidence demonstrating that any of the Genesee Defendants are liable for failure to intervene in other uses of force. There is no evidence on the record—or, at least, Plaintiff has not pointed to any—demonstrating that the Genesee Defendants had means or opportunity to prevent force from their fellow officers. Nor is there any evidence showing that any of the individual Genesee Defendants should have anticipated excessive force from any of the others. In essence,

Plaintiff argues that there are questions of fact as to the failure to intervene because the Genesee Defendants were all present while the alleged uses of force occurred. But mere presence is insufficient to establish liability. *Burgess*, 735 F.3d at 475. Plaintiff must come forward with some affirmative evidence that the Genesee Defendants had both the means and the opportunity to intervene—that is, that they had some "direct responsibility." In the absence of such evidence—not just conjectures or raised possibilities—the Genesee Defendants are entitled to summary judgment on Plaintiff's claims for failure to intervene.

### D. Qualified Immunity

Qualified immunity shields government officials from civil liability when they take actions in their official capacity that "[do] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The court, in deciding whether qualified immunity applies, analyzes two questions: (1) whether "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right," and (2) whether the constitutional right was "'clearly established' at the time of defendant's alleged misconduct," *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). "Clearly established" is considered "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Which question to address first is within the sound discretion of the trial court. *Pearson*, 555 U.S. at 236.

Whether an officer is entitled to qualified immunity is a question of law. *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 525 (6th Cir. 2015). "An answer of 'yes' to both of the qualified immunity questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). Although the defendant must initially raise it as a defense, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (quoting *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002)).

### i. The Burton Defendants

The Burton Defendants argue that they are entitled to qualified immunity for Plaintiff's Fourth Amendment claims. But they provide next to no explanation as to why. Though the Burton Defendants spend nearly two pages of briefing on the issue, all but one sentence comprise quotations and summary of case law. To the extent that the Burton Defendants provide any "argument," it is this: "Under the circumstances described above, Plaintiff is unable to overcome qualified immunity, and his cause of action should be dismissed even if Defendants' actions could, when viewed in hindsight, arguably be considered unconstitutional." (Dkt. #58 Pg. ID 408.)

Read generously, their argument seems to be that—even if their conduct amounted to a constitutional violation—the right was not clearly established. The argument is easily disposed of: it was clearly established that the Fourth Amendment protects the right to be free from detention in the absence of reasonable suspicion, *see Hoover v. Walsh*, 682 F.3d 481, 493 (6th Cir. 2012), and the right to be free of arrest in

the absence of probable cause, *see Courtright v. City of Battle Creek*, 839 F.3d 513, 523 (6th Cir. 2016).

### ii. The Genesee Defendants

The Genesee Defendants similarly pay minimal attention to their claim for qualified immunity. As to Defendant Kirby, their claim is premised on the argument that his use of pepper spray on Plaintiff was not unreasonable under the circumstances. But there is, as noted above, a genuine issue of material fact as to whether Defendant Kirby was justified in pepper spraying Plaintiff. Perplexingly, at the hearing on this motion, the Genesee Defendants argued that the court considers only the officer's version of the facts when deciding whether qualified immunity applies. According to the Genesee Defendants, because qualified immunity is considered from the perspective of a reasonable officer in the defendant's position, the court gives credence to the defendant officer's perspective alone. This argument has no basis in the case law. On a motion for summary judgment, the *facts*—including those bearing on the officer's perspective—are viewed in the light most favorable to the plaintiff. *Greco v. Livingston Cty.*, 774 F.3d 1061, 1063–64 (6th Cir. 2014) ("When deciding whether an officer violated such a clearly established right, we may not call off the trial merely because an officer *says* he or she acted reasonably in the face of competing testimony. We instead consider the facts in the light most favorable to the plaintiff." (emphasis original)).

Plaintiff's right not to be pepper sprayed when posing no threat or disturbance (as he contends) was clearly established. *See Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) ("If the jury determines that [the defendant] arrested plaintiff without probable cause and gratuitously maced a helpless and incapacitated person, then as a legal

matter no reasonable officer would believe that such conduct would not violate plaintiff's constitutional rights.") The Genesee Defendants point out in reply that the use of mace has been approved by courts where it has been deemed necessary to impose security and order in a custodial setting. (*See* Dkt. #73 Pg. ID 1014.) But they do not allege—nor could they—that the use of mace has been approved where, taken in the light most favorable to Plaintiff, there was no need to impose security and order.

As to the remaining Genesee Defendants, they ask for qualified immunity only as it relates to Plaintiff's claims for failure to intervene. (*See* Dkt. #59 Pg. ID 439.) The Genesee Defendants being entitled to summary judgment for those claims on other grounds, the court need not consider whether they are also entitled to summary judgment on the basis of qualified immunity.

### E. Fifth, Sixth, and Eighth Amendments

Plaintiff having agreed before the hearing to dismiss his claims for violations of the Fifth, Sixth, and Eighth Amendments against the Burton Defendants (*see* Dkt. #61), those claims remained only as to the Genesee Defendants. At the hearing, however, Plaintiff agreed to dismiss his Fifth, Sixth, and Eighth Amendment claims against the Genesee Defendants as well. These claims, therefore, will be dismissed.

### F. Conspiracy

Finally, the Genesee Defendants argue that they are entitled to summary judgment as to Plaintiff's claim that they engaged in a conspiracy to violate his constitutional rights. Plaintiff responds that the available evidence shows that the Genesee Defendants engaged in excessive use of force, that they failed to preserve

evidence related to that use of force, and that they did not write their reports in a way that reflected the force used.

To prove a § 1983 conspiracy claim, the plaintiff must show that "there was a single plan, that the alleged coconspirator[s] shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). Because direct evidence of a conspiracy is rarely available, circumstantial evidence may provide adequate proof. *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).

The Genesee Defendants are entitled to summary judgment here because Plaintiff brings forth no evidence of an agreement or a single plan to violate Plaintiff's constitutional rights. While circumstantial evidence may be used to show the existence of a conspiracy, circumstantial evidence requires more than some showing that a conspiracy *could* have existed given the evidence. That the available evidence is consistent with a conspiracy, in other words, is not sufficient evidence that a conspiracy in fact existed. Absent some evidence that the Genesee Defendants agreed to violate Plaintiff's constitutional rights and took steps in furtherance of that conspiracy, the Genesee Defendants are entitled to summary judgment on this claim.

## IV. CONCLUSION

All told, Defendants seem to misunderstand the difference between an "inconsistency" and what it means to be "blatantly contradicted by the record." While acknowledging that the video evidence in this case does not depict the entirety of Plaintiff's time at the Genesee County jail (*see* Dkt. #59 Pg. ID 428–29), Defendants

perplexingly argue that, if not depicted in that video, Plaintiff's alleged events could not have happened. Nor are Plaintiff's allegations, as Defendants sometimes suggest, "blatantly contradicted by the record" just because the Defendants' testimony is harmoniously in opposition to Plaintiff's. (*See, e.g.*, Dkt. #72 Pg. ID 1007.) Defendants' relative chorus of voices cannot, at this stage, drown out Plaintiff's otherwise uncontradicted testimony such that Defendants are entitled to summary judgment. Accordingly,

IT IS ORDERED that Plaintiff's claims against the Genesee Defendants for violations of the Fifth, Sixth, and Eighth Amendments are DISMISSED.

IT IS FURTHER ORDERED that the Burton Defendants' Motion for Summary Judgment (Dkt. #58) is GRANTED IN PART and DENIED IN PART. Specifically, it is GRANTED as to Plaintiff's claims against the Burton Defendants for excessively forceful handcuffing, excessive force at the Genesee County jail, and failure to intervene. It is DENIED in all other respects.

IT IS FURTHER ORDERED that the Genesee Defendants' Motion for Summary Judgment (Dkt. #59) is GRANTED IN PART and DENIED IN PART. Specifically, it is GRANTED as to Plaintiff's claims against the Genesee Defendants for failure to intervene and conspiracy. It is DENIED in all other respects.


                                        s/Robert H. Cleland                    /
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  May 16, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 16, 2018, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\KNP\Civil\16-14093.LANCASTER.summary.judgment.KNP3.docx